## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Civil Action No. 03-2540 (RCL)** |
| | ) | |
| **$6,976,934.65 PLUS INTEREST** | ) | |
| **DEPOSITED INTO ROYAL BANK OF** | ) | |
| **SCOTLAND INTERNATIONAL,** | ) | |
| **ACCOUNT NUMBER 2029-56141070,** | ) | |
| **HELD IN THE NAME OF SOULBURY** | ) | |
| **LIMITED, AND PROPERTY TRACEABLE** | ) | |
| **THERETO,** | ) | |
| | ) | |
| **Defendant, and** | ) | |
| | ) | |
| **SOULBURY LIMITED,** | ) | |
| | ) | |
| **Claimant** | ) | |
| | ) | |
| | ) | |

## MEMORANDUM OPINION

In this civil *in rem* action, the United States seeks forfeiture of nearly $7 million in

defendant funds traceable to deposits in the Royal Bank of Scotland International ("RBSI"),

located on the island of Guernsey.[1]  The funds were deposited in an RBSI account held by a

British Virgin Islands company named Soulbury Limited.  On December 15, 2003, the United

States filed its Complaint and the Clerk of the Court issued a Warrant of Arrest *In Rem* for the

defendant property.  The funds were seized on December 17, 2003 from an interbank account

held by RBSI at Harris International in New York under the authority of 18 U.S.C. § 981(k),

---

[1]Guernsey is one of the semi-autonomous Channel Islands off the British coast.

which under certain circumstances authorizes the seizure of funds held in an interbank account in America if the subject bank has an interbank relationship with an overseas institution in which the defendant funds are held.

Soulbury filed its claim to the funds on March 1, 2004 [4&5], an Answer on March 22, 2004 [8], and an Amended Answer on April 7, 2004 [10].  On May 28, 2004, the Court stayed this matter pending resolution of a grand jury investigation [25], and lifted the stay on March 24, 2006. [46]

## I.      BACKGROUND

According to the United States, Soulbury Limited "is a foreign shell corporation controlled by, and the alter-ego of," one William Scott.  Mot. to Strike [53] at 2.  The government contends that Scott, formerly a U.S. citizen, ran a network of offshore Internet gambling sites from the Caribbean island of Antigua.  Complaint ¶¶ 7, 9, 11.  Chief among these is World Wide Telesports ("WWTS").  According to the government, Scott engaged in money laundering, wire fraud, and other criminal activity related to these gambling enterprises, from at least the latter 1990s to at least 2002.  *Id*. ¶¶ 17-25.

In 1998, a criminal complaint was filed against Scott in the Southern District of New York for conspiracy to violate the Wire Act, 18 U.S.C. § 1084, and other charges related to his gambling enterprises, and a warrant was issued for his arrest.  Motion to Strike [53] Ex. B.  Also named in the complaint was Jessica Davis, an employee of Scott's at WWTS.  In April of 2005, Scott was indicted in the District of Columbia on money laundering and other charges related to the same gambling operations, and a warrant was issued for his arrest.  *See* Motion to Strike [53],

Ex. S.  The indictment was unsealed and made public on May 17, 2006.[2]  The D.C. indictment also named Jessica Davis, WWTS, and Soulbury Limited.[3]  In short, the government asserts that Scott ran a network of illegal internet casinos and sports books that handled bets from the United States, and around which the criminal charges center.  The government alleges that the funds deposited in Soulbury's RBSI account were related to the crimes charged in the two indictments and were thus subject to forfeiture to the United States under 18 U.S.C. § 981.  *Id.* ¶¶ 18, 21, 24.

The day after Scott's indictment was unsealed, the government and Soulbury each filed dispositive motions that are now before the Court.  Soulbury filed a Motion [52] for Judgment on the Pleadings, arguing for judgment on the grounds, *inter alia*, that the government had improperly laid venue and had not properly executed the arrest *in rem* of the defendant funds.  Later the same day, the government filed a Motion [53] to Strike the Claim and Answer of Claimant Soulbury Limited Pursuant to 28 U.S.C. § 2466, which contends that the federal fugitive disentitlement statute enables the Court to disallow Soulbury from proceeding with its claim because Soulbury is a company acting on behalf of a fugitive, Scott.  Soulbury attacks the government's motion as untimely and unwarranted.  If the Court finds fugitive disentitlement to be both applicable and appropriate in this case, it would act to bar claimant from taking any action in pursuit of its claim, including its Motion for Judgment on the Pleadings.  For that reason, the Court will address the government's motion first.

---

[2]According to the government, the delay in unsealing the indictment, which corresponds to the stay in the forfeiture case, was attributable to the grand jury investigation and to efforts to arrest Jessica Davis.  Motion to Strike [53] at 4-5.

[3]Curiously, the government appears to have taken no action to bring Soulbury before it to answer these charges.

## II.      THE FUGITIVE DISENTITLEMENT DOCTRINE

### A.      At Common Law

The doctrine of fugitive disentitlement developed at common law, initially as a means of barring fugitives from bringing appeals in their criminal cases. *See Ortega-Rodriguez v. United States*, 507 U.S. 234 (1993) (collecting cases). The logic went that a fugitive should not be able to avail himself of the courts to secure the benefit of a favorable appellate outcome when he has removed himself from a court's power to enforce an adverse outcome, "for it is clearly within our discretion to refuse to hear a criminal case in error, unless the convicted party . . . is where he can be made to respond to any judgment we may render." *Smith v. United States*, 94 U.S. 97, 97 (1876).

In addition to enforceability concerns, the doctrine also rested on the ground that a fugitive should not be able to exploit judicial processes to his advantage in one matter while scoffing at them in another.[4] Courts ruled that the fugitive waived or was stripped of the right to use the courts because his escape "disentitles the defendant to call upon the resources of the Court for determination of his claims." *Molinaro v. New Jersey*, 396 U.S. 365, 366 (1970). Many cases also applied the doctrine to bar fugitives from seeking relief as plaintiffs in civil suits, concluding that the rule of fugitive disentitlement in criminal cases "should apply with greater force in civil cases where an individual's liberty is not at stake." *Conforte v. Commissioner of Internal Revenue*, 692 F.2d 587, 590 (9th Cir. 1982) (disallowing fugitive from

---

[4]One court reasoned that disentitlement was certainly a proper outgrowth of the judicial authority embodied by Federal Rules of Civil Procedure 37 and 41, which "render a party's misconduct a basis for the dismissal of his case," especially since those Rules authorize dismissal for conduct "far less egregious than a flight from justice." *Ali v. Sims*, 788 F.2d 954, 959 (3d Cir. 1986).

appealing tax court ruling); *see also Broadway v. City of Montgomery*, 530 F.2d 657 (5th Cir. 1976) (court refused to hear appeal from fugitive seeking damages and injunctive relief from alleged illegal wire tap); *Doyle v. Department of Justice*, 494 F.Supp. 842 (D.D.C. 1980), *aff'd.*, 668 F.2d 1365 (D.C. Cir. 1981) (disallowing FOIA case brought by fugitive); *United States v. Commanding Officer*, 496 F.2d 324, 326 (1st Cir. 1974) (court refused to hear habeas petition seeking relief from a specific Army regulation where petitioner was at large); *Brin v. Marsh*, 596 F.Supp. 1007 (D.D.C. 1984) (Richey, J.) (court-martialed soldier who went AWOL and remained at large not allowed to call on court's resources to hear his claim for discharge and restoration of retirement benefits).

By the mid-1990s, "courts routinely held that a fugitive in a criminal case could not avail himself of the court to contest a civil forfeiture action directed against his property." Stefan D. Cassella, *The Civil Asset Forfeiture Reform Act of 2000: Expanded Government Forfeiture Authority and Strict Deadlines Imposed on All Parties*, 27 J. Legis. 97, 115 (2001) (*hereinafter* "Cassella"); *see also United States v. Collazos*, 368 F.3d 190, 197 (2d Cir. 2004) (collecting forfeiture cases). At the same time, the Supreme Court had not directly considered the doctrine's application to civil matters. *Cf. Conforte v. Commissioner of Internal Revenue*, 459 U.S. 1309 (1983) (Rehnquist, J., in chambers) (denying stay in civil case where court below had disentitled fugitive from appealing tax court ruling).

That changed in *Degen v. United States*, 517 U.S. 820 (1996), where the Supreme Court held that the "harsh sanction of absolute disentitlement" could not be imposed on fugitives in civil forfeiture actions solely under the courts' "inherent authority to protect their proceedings and judgments." *Id.* at 823, 827. While noting its "disquiet at the spectacle of a criminal

defendant reposing [overseas], beyond the reach of our criminal courts, while at the same time mailing papers to the court in a related civil action and expecting them to be honored," *id.* at 828, the Court was more concerned about the "danger of overreaching when one branch of the Government, without benefit of cooperation or correction from the others, undertakes to define its own authority." *Id.* at 823. In short, the invocation of disentitlement was too severe in that case and not justified by recourse to the court's inherent authority alone. The Supreme Court specifically reserved passing on the propriety of "enforcement of a disentitlement rule under proper authority." *Id.* at 828.

**B.      The Fugitive Disentitlement Statute**

Congress responded to this invitation in 2000 by passing a discretionary version of the fugitive disentitlement doctrine for civil forfeiture cases, as part of a large-scale revision of civil asset forfeiture laws, the Civil Asset Forfeiture Reform Act ("CAFRA"). Pub. L. 106-185, 114 Stat. 202 (2000). CAFRA was "the most comprehensive revision of the civil asset forfeiture laws to be passed by Congress since the first forfeiture statutes were enacted in 1789." *Rohlsen v. DEA Atlanta Airport Task Force*, 2005 U.S. Dist. LEXIS 25163 at *10 (N.D. Ga. 2005).

The disentitlement provision, codified at 28 U.S.C. § 2466, sought to deal with the "unseemly spectacle" of "a criminal defendant who, facing both incarceration and forfeiture for his misdeeds, attempts to invoke from a safe distance only so much of a United States court's jurisdiction as might secure him the return of alleged criminal proceeds while carefully shielding himself from the possibility of a penal sanction." *United States v. Collazos*, 368 F.3d 190, 200 (2d Cir. 2004). The disentitlement statute, which is titled "Fugitive disentitlement," reads as follows:

(a) A judicial officer may disallow a person from using the resources of the courts of the United States in furtherance of a claim in any related civil forfeiture action or a claim in third party proceedings in any related criminal forfeiture action upon a finding that such person –

    (1) after notice or knowledge of the fact that a warrant or process has been issued for his apprehension, in order to avoid criminal prosecution –

        (A) purposely leaves the jurisdiction of the United States;

        (B) declines to enter or reenter the United States to submit to its jurisdiction; or

        (C) otherwise evades the jurisdiction of the court in which a criminal case is pending against the person; and

    (2) is not confined or held in custody in any other jurisdiction for commission of criminal conduct in that jurisdiction.

(b) Subsection (a) may be applied to a claim filed by a corporation if any majority shareholder, or individual filing the claim on behalf of the corporation is a person to whom subsection (a) applies.

Subsection (a) originally constituted the entirety of the statute.  Subsection (b) was added in 2001, and the rest of the statute was retitled as subsection (a).  Pub. L. 109-162, 119 Stat. 3123.  The statute had the effect of reviving the preexisting fugitive disentitlement doctrine, such that pre-*Degen* case law applies insofar as it is consistent with the statute.  Cassella, 27 J. Legis. at 115 n.110.  We now apply that statute to the facts of this case.

## III.   ANALYSIS

## A.   Proper Procedure for § 2466 Motion

A bit of taxonomy is in order at the threshold, as there is dispute over what to call the government's motion and how to handle it procedurally.  Soulbury argues that the motion is what the government has called it – a motion to strike – and thus should be governed by the Federal Rule of Civil Procedure applicable to motions to strike at the pleadings stage, Rule 12(f).  That Rule allows a court to "order stricken from any pleading any insufficient defense or any redundant, immaterial, impertinent, or scandalous matter."  Fed. R. Civ. P. 12(f).  A party may move to strike "before responding to a pleading or, if no responsive pleading is permitted by

these rules, upon motion made by a party within 20 days after the service of the pleading upon

the party or upon the court's own initiative at any time." *Id*. Soulbury deems the government's

motion untimely under this Rule, since it was filed almost two months after the Court dissolved

the stay in this case, which presumably tolled the deadline for moving to strike Soulbury's Claim

and Answer, which were filed two years prior to the motion to strike.

According to the government, its motion is not governed by Rule 12(f), but is instead a

dispositive motion most resembling one for partial summary judgment.[5]  The courts that have

considered motions under § 2466 have variously called them motions to strike the claim or

answer and enter judgment, *see, e.g., United States v. Timbers Reserve*, 999 F.2d 452 (10th Cir.

1993); motions to dismiss the claim, *see, e.g., United States v. $1,278,795.00 United States*

*Currency*, 2006 U.S. Dist. LEXIS 23542 (S.D. Tex. Mar. 30, 2006) (construing motion to strike

answer as motion to dismiss claim); *United States v. All Right, Title, and Interest in Real*

*Property & Appurtenances Located at Trump World Towers*, 2004 U.S. Dist. LEXIS 17396

(S.D.N.Y. 2004); *United States v. One Parcel of Real Estate at 7707 S.W. 74th Lane*, 868 F.2d

1214 (11th Cir. 1989); or motions for summary judgment.  *United States v. One 1988 Chevrolet*

*Cheyenne Half-Ton Pickup Truck*, 357 F.Supp. 2d 1321 (S.D. Alab. 2005) (motion captioned as

one to strike claim or in alternative for partial summary judgment).  *Cf. Lazaridis v. The Herald*

*Co., Inc.*, 2006 U.S. Dist. LEXIS 5627 (W.D. Mich. Jan. 26, 2006) (treating common law

fugitive disentitlement motion as one to dismiss under Rule 12(b)(6) and converting to summary

judgment).

None of the courts have treated such motions as being governed by Rule 12(f).  By its

---

[5]Partial because the government at this time seeks only to disallow Soulbury's claim.

terms, Rule 12(f) applies to motions seeking to strike an "insufficient defense or any redundant, immaterial, impertinent, or scandalous matter," not to motions which seek to bar a claimant from proceeding all together.  A Rule 12(f) motion is based on the content of a pleading or part thereof, not on the identity of the party submitting a pleading.  Rule 12(f) simply has no application to a § 2466 disentitlement motion.

Essentially every court to have considered a disentitlement case – both under the common law and post-CAFRA – has treated the motion as something like a motion to dismiss, has looked to matters outside the pleadings, and has, where appropriate, allowed for the possibility of conversion to summary judgment.  *See, e.g., United States v. $1,231,349.68 in Funds*, 227 F.Supp. 2d 130 (D.D.C. 2002) (Friedman, J.); *Trump Towers*, 2004 U.S. Dist. LEXIS 17396 (S.D.N.Y. 2004); *United States v. $138,381.00 in U.S. Currency*, 240 F.Supp. 2d 220 (E.D.N.Y. 2003); *Collazos v. United States*, 368 F.3d 190 (2d Cir. 2004); *United States v. $1,278,795.00 United States Currency*, 2006 U.S. Dist. LEXIS 23542 (S.D. Tex. Mar. 30, 2006); *United States v. One 1988 Chevrolet Cheyenne Half-Ton Pickup Truck*, 357 F.Supp. 2d 1321 (S.D. Alab. 2005); *United States v. Real Property Located at Incline Village*, 47 F.3d 1511, 1516 (9th Cir. 1995) (claimant must put forward *evidence* showing why court should not disentitle claim, not just *argument*).

It is especially appropriate for a court to look at matters outside the pleadings when fugitive disentitlement is at issue, for several reasons.  First, this inquiry is concerned, at heart, with a person's eligibility to invoke the authority of a court, and with the court's deployment of judicial resources.  In that sense, it resembles a court's inquiry into its subject matter jurisdiction,

in which courts routinely look beyond the pleadings.[6]  *See Lipsman v. Secretary of the Army*, 257

F.Supp. 2d 3, 5-6 (D.D.C. 2003) (Urbina, J.).  Second, while the disentitlement decision

generally will be made at an early stage of the proceedings, a court should consider as much

information as is available before deciding whether to invoke the significant measure of

disallowing a claim.  The Court therefore holds that a § 2466 motion is properly treated as one to

dismiss the claim, on which the Court may consider matters outside the pleadings.

Typically, courts considering § 2466 motions have been able to make the necessary §

2466 findings based on the record before them at the time, including extraneous matters, and

have issued orders – whether to dismiss, to strike, or for summary judgment – with the practical

effect of dismissing the claimant.  The Court will thus consider each element of § 2466 in turn,

based on the record before it.

### B.      Application of the Disentitlement Elements to Soulbury

The government has asserted that William Scott is the person to whom § 2466(a) applies,

and that his disentitlement can be extended to Soulbury under § 2466(b).  As stated, § 2466(a)

has five prongs.  A court *may*, in its sound discretion, invoke the disentitlement statute upon a

---

[6]While a disentitlement motion has theoretical similarities to a motion attacking standing, which is a motion to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1), disentitlement is a discretionary measure that does not strip a case of its nature as a justiciable case or controversy.  *Molinaro v. New Jersey*, 396 U.S. 365, 366 (1970).  In addition, Rule 12 does not allow for the conversion of Rule 12(b)(1) motions, while there is no such restriction on § 2466 motions.  But beyond that, there are other similarities between the disentitlement and subject matter jurisdiction inquiries.  For instance, a court may dismiss at any time for lack of subject matter jurisdiction, and § 2466 does not impose time constraints on a court.  Of course, a court may consider any unreasonable delay or dilatory conduct on the part of the government in bringing a § 2466 motion as a factor weighing against disentitlement.  Disentitlement is also similar to a subject matter jurisdiction inquiry in that both issues can be raised by the court on its own motion.

finding that:

> "(1) a warrant or similar process must have been issued in a criminal case for the claimant's apprehension; (2) the claimant must have had notice or knowledge of the warrant; (3) the criminal case must be related to the forfeiture action; (4) the claimant must not be confined or otherwise held in the custody in another jurisdiction; and (5) the claimant must have deliberately avoided prosecution by (A) purposefully leaving the United States; (B) declining to enter or reenter the United States, or (C) otherwise evading the jurisdiction of a court in the United States in which a criminal case is pending against the claimant."

*Collazos v. United States*, 368 F.3d 190, 198 (2d Cir. 2004).  The Court will consider each element in turn.  If a required element of subsection (a) is not present, or if subsection (b) does not pertain, the Court lacks the authority to disallow the claim.  As will be seen, the record does not allow a definitive ruling on disentitlement at this time, in either direction.

### 1.     Warrant or similar process

The Court finds that warrants for the arrest of William Scott were issued in connection to both the 1998 New York criminal complaint and the 2005 Washington D.C. grand jury indictment.  Motion to Strike [53], Ex. S (D.C. warrant); Reply in Support of Motion to Strike [57], Ex. B (New York warrant).

### 2.     Notice or Knowledge

The record supports a finding that William Scott has knowledge of the warrants.  In standard disentitlement cases, the fugitive and claimant were the same individual, so courts readily could ascertain the claimant's knowledge.  At the very least, a claimant who asserted that he did not know about his fugitivity learned about it during the forfeiture action, and if he stayed a fugitive, became subject to disentitlement.  Because Scott's relationship to Soulbury is an open

question, it is not clear that Soulbury's knowledge of Scott's warrants can be imputed to Scott.[7]

The cases that have construed this requirement have not required that the fugitive be served with actual notice or that he have complete knowledge of all charges against him. Instead they have inquired whether the record discloses sufficient information that should put the claimant on notice that he has been called to answer criminal charges in the United States – that is, the claimant in the forfeiture case must know or have reason to know that he is subject to arrest in the United States, and generally what for.[8] *See, e.g., United States v. $1,231,349.68 in Funds*, 227 F.Supp. 2d 130, 132 (D.D.C. 2002) (Friedman, J.) (claimant had knowledge where totality of government's activity "certainly made him aware what allegations were being made and that the government was considering bringing criminal charges against him," such that claimant knew he was subject to arrest).

The following factors, among others, would support a finding that William Scott has notice or knowledge of the fact that he is subject to arrest in the United States: First, the criminal investigation of and charges against Scott and his companies have received substantial media coverage. It is apparent from this coverage that the news has reached the government of Antigua,

---

[7]Soulbury argues, to no avail, that Scott could not have known about his fugitive status because the D.C. indictment against him was not unsealed until the day before the government moved to disentitle him. First, this does not address Scott's knowledge of the 1998 warrant. A fugitive need only have notice that he is subject to arrest in the United States. He need not have notice of all warrants for his arrest. Second, Scott's past knowledge is not relevant to the statutory analysis. What matters is Scott's notice or knowledge at the time the Court determines whether to disentitle him.

[8]The relevant portion of the statute calls for "notice or knowledge of the fact that a warrant or process has been issued for his apprehension." The crux of this requirement is that the claimant be aware of the fact that he is subject to apprehension in the United States. The statute does not require that the claimant have any specific knowledge about the warrant or similar process that has been issued for his arrest, such as its exact contents.

the tiny nation where Scott apparently resides.  Charges have also been brought against Jessica

Davis, who appears to have handled a substantial amount of Scott's business, and against WWTS

and Soulbury Limited, companies through which Scott allegedly held significant assets.  Scott

likely has gained word of the charges against him from one of these sources, or from his wife,

who appears to be a part owner of the claimant, Soulbury.

In addition, Soulbury's attorneys have represented that they can convey messages to

Scott, though it is unclear whether they do so through intermediaries.  Through the course of this

litigation, Soulbury's attorneys have become abundantly aware of the warrants at issue.  From

this, the Court is left to conclude that either Scott or his agents have actual knowledge of the

warrants.  Courts have been willing to rest a finding of knowledge on the fact that a claimant's

attorney has knowledge that the claimant is subject to arrest.  *See, e.g., United States v. One 1988*

*Chevrolet Cheyenne Half-Ton Pickup Truck*, 357 F.Supp. 2d 1321, 1327 (S.D. Alab. 2005);

*United States v. $1,278,795.00 United States Currency*, 2006 U.S. Dist. LEXIS (S.D. Tex. Mar.

30, 2006).

Of course, if the Court could conclude at this time that Scott effectively controls

Soulbury, then Soulbury's knowledge could be imputed to him, and the knowledge inquiry

would be quite brief.  As determined below, further briefing and supplementation of the record is

required on that front, which should allow for a more definitive determination of the notice issue.

**3.     Criminal Case Must be Substantially Related to the Forfeiture Action**

In construing whether a criminal matter is "related to" a civil forfeiture proceeding for the

purposes of disentitlement, courts follow the same approach employed by the *Collazos* district

court, which considered "the degree of similarity between the parties, witnesses, facts, and

circumstances involved in the two proceedings, without requiring an identity with respect to any one or more factors." *United States v. Contents of Account No. 68108021*, 228 F.Supp. 2d 436, 440 (S.D.N.Y. 2002) (defining "related" by reference to civil forfeiture statute, 18 U.S.C. § 981(g)(4)). This common-sense approach looks to the totality of the circumstances. Here the D.C. indictment directly traces the funds, which were allegedly involved in the money laundering activity, and which were proceeds of or related to the gambling enterprises that form the common core of the New York and D.C. cases. The criminal and forfeiture actions are related for purposes of the statute.

### 4.       Claimant Must Not Be Confined or Otherwise Held in Custody Elsewhere

Courts find this prong to be established when there is no suggestion that the individual at issue is in custody somewhere. Since the record in this case gives no indication to the contrary, the Court finds that Scott is not in custody or otherwise confined in another jurisdiction.

### 5.       Fugitive Status

In addition, the Court must find that the individual at issue is a fugitive, as set forth by the statute. Courts use a totality of the circumstances approach to determining fugitive status. *Collazos*, 368 F.3d at 201; *see also One 1988 Chevrolet Cheyenne*, 357 F.Supp. 2d at 1328-29 (assessing fugitive status based on "totality of the evidence"). They have not read the requirement of fugitive status in an overly technical manner, but have aimed to sweep up people "who know that they are subject to arrest in this country" yet have not subjected themselves to criminal process. *Collazos*, 368 F.3d at 197; *see also Brin v. Marsh*, 596 F.Supp. 1007, 1010 (D.D.C. 1984) (applying "fugitive from justice" doctrine to court-martialed soldier who remained "at large," though somewhere in the United States); *United States v. All Right, Title and Interest*

14

*in Real Property, Appurtenances, and Improvements Known as Tamarind Drive*, 2005 U.S. Dist. LEXIS 23819 at *6 ("A defendant is a fugitive from justice when he 'actively resists returning from abroad to face [criminal] charges.'") (quoting *United States v. Eng*, 951 F.2d 461, 464 (2d Cir. 1991)); *United States v. Contents of Account Number 68108021*, 228 F.Supp. 2d 436, 443 (S.D.N.Y. 2002) (claimant was fugitive where she knew she was subject to arrest but "declined to face the charges against her").

Under the totality of the circumstances, the Court finds that William Scott has declined to enter or reenter the United States to avoid prosecution, and has otherwise evaded the jurisdiction of the U.S. courts. The government alleges, and Soulbury does not dispute, that Scott is outside the United States. He was allegedly outside the country after both sets of charges were brought, so the first prong, "purposely leaves the jurisdiction of the United States," does not apply. But both other prongs apply. Scott has not entered or reentered the United States. The second prong aims at instances of "constructive flight," where "a defendant, while legally outside the jurisdiction, decides not to return to face pending criminal charges against him." *One 1988 Chevrolet Cheyenne*, 357 F.Supp. 2d at 1328 n.11; *see also Collazos*, 368 F.3d at 197. If the second prong for ascertaining fugitive status somehow did not apply to Scott, the third prong would, as it requires simply that the individual "otherwise evades" the court's jurisdiction, and the "evasion referred to in subpart (C) reaches beyond [the statute's] specific examples to myriad means that human ingenuity might devise to permit a person to avoid the jurisdiction of a court where a criminal case is pending against him." *Collazos*, 368 F.3d 190, 200. For instance, there is evidence on the record to support a finding that Scott established residence in Antigua, renouncing his U.S. citizenship and adopting Antiguan citizenship, a device suggesting that he

15

was trying to avoid extradition to the United States.  In whatever manner effected, a person is a fugitive for purposes of § 2466 if he is subject to arrest in the United States and has not submitted himself to the jurisdiction of the courts.

Soulbury argues, unconvincingly, that the government has failed to show that avoiding prosecution is *the* reason Scott has failed to enter the United States and has otherwise evaded its jurisdiction.  The rationale is apparently that Mr. Scott is delighted to be outside the United States, and would happily remain so, warrants or not.  But the statute does not require a finding by the court that claimant would enter the United States *but for* the warrants.  It simply requires that the fugitive's evasion be the result of purposeful conduct.  For instance, courts have considered whether certain factors such as illness might obviate the purposefulness of the claimant's conduct and thus excuse his absence from the jurisdiction.  *See 1988 Chevy*, 357 F.Supp. 2d 1321, 1327-28 & nn. 11-12.  In addition, the statute conceives of two obvious conditions – being confined or otherwise held in custody – that would excuse a claimant's failure to submit to a court's jurisdiction.  The record does not show any factor that would excuse Scott's failure to answer the charges against him.

## 6.    Applicability of Subsection (b)

Having tentatively concluded that Scott is a person covered by § 2466(a), § 2466(b) would directly authorize disentitlement "to a claim filed by a corporation if any majority shareholder, or individual filing the claim on behalf of the corporation is a person to whom subsection (a) applies."  The record is unclear as to Mr. Scott's ownership interest in Soulbury. The materials submitted by the government, none of which has been controverted by any evidence from Soulbury, indicate that Mr. and Mrs. Scott were the only beneficial owners of the

16

company.  From the record before it, the Court simply cannot determine who is a "majority shareholder" of the company for the purposes of the statute.

The government notes that such a finding may be unnecessary, since the purpose of this ambiguous provision is to capture major or controlling shareholders, not just *the* majority shareholder.  According to this argument, the statute is ambiguous because it uses the curious phrase "any majority shareholder."  This phrase suggests that there can be more than one majority shareholder, which is impossible.  According to the government, the ambiguity justifies recourse to the legislative history and congressional intent behind the statute, so that the ambiguous phrase can be given meaning and the statute can do its intended work.

Subsection (b) is indeed ambiguous.  The phrase "any majority shareholder" has no readily ascertainable meaning, since the definition of "majority" allows of only one majority shareholder.[9]  Recourse to legislative history and congressional intent is thus in order. Subsection (b) was added to § 2466 as part of 2001's Patriot Act.  Pub. L. 107-56, 115 Stat. 272 (2001).  There is very little legislative history behind this provision of the Patriot Act.  The best source of legislative history is the House Report, which had the following to say about the amendment to § 2466:

> Section 117. Corporation Represented by a Fugitive
>
> Currently, 28 U.S.C. § 2466 permits a court to disallow the claim filed in a forfeiture proceeding by a person who is a fugitive in a related criminal case.  The amendment clarifies that a natural person who is a fugitive may not circumvent this provision by filing, or having another person file, a claim on behalf of a corporation that the fugitive controls.

_____

[9]Though it would not by itself be sufficient to render the statute ambiguous, the Court notes that the comma following "shareholder" in § 2466(b) is out of place, suggesting that the provision was intended to include a series of more than two items but was never completed.

As has been noted elsewhere, the Patriot Act was passed as part of a rapid response to the terrorist attacks of September 11, 2001, with relatively little debate or discussion.  In what appears to be the only direct reference to fugitive disentitlement in the hearings preceding passage of the Patriot Act, a Justice Department official expressed similar concern over fugitives using corporations they control to submit claims they themselves could not submit:

> [W]e must take steps to crack down on the ease with which foreign criminals use correspondent accounts of foreign banks maintained here in U.S. banks to hide the profits of their crimes.  We must prevent fugitives from hiding behind a corporate veil or front from challenging those forfeitures.  If they can't do it in their own right while they're on the run, they shouldn't be able to do it behind a corporate front.

Remarks of Mary Lee Warren, Dep. Asst. Attorney General, Criminal Division, Before Hearing of House Financial Services Committee, "Dismantling the Infrastructure of Global Terrorism," (Oct. 3, 2001).

This limited legislative history shows a congressional emphasis on whether the fugitive controlled the corporation and was using it as a front, not on his exact percentage shareholding. The House Report is particularly telling in that it says the amendment "clarifies" that a fugitive may not avoid disentitlement "by filing, or having another person file, a claim on behalf of a corporation that the fugitive controls."  This item recognizes that § 2466, as previously enacted, was not limited to disentitlement of natural persons.  The operative provision of § 2466(a), unchanged by the addition of subsection (b), states that "[a] judicial officer may disallow a person from using the resources of the courts of the United States in furtherance of a claim in any related civil forfeiture action . . .."

The statute gives a court the power to "disallow a person from using the resources of the courts."  Courts do so by striking, dismissing, or entering summary judgment on a claim.  The

statute does not say that the claim has to have been asserted by the person who is being disallowed.  Rather, a court may disallow a person "from using the resources of the courts" through the form of an intermediary controlled by the fugitive.  Whatever subsection (b) means, it appears to have been intended to clarify the fact that fugitive disentitlement could apply to a corporate entity.  Whatever clarity subsection (b) adds – or subtracts – from the statute, the statute by its terms allows a court to act in cases where the relationship between a corporate entity-claimant and a fugitive natural person is such that the person can be said to be acting through the corporate entity in an attempt at "using the resources of the courts of the United States in furtherance of a claim" in a forfeiture case.  The inquiry would seem to resemble a veil piercing or alter ego inquiry at common law.  All that subsection (b) appears to add is a presumption that a fugitive's disentitlement will be imputed to a corporation of which he is a majority shareholder or on behalf of whom he files a claim.

While the record is not clear as to whether William Scott is *the* majority shareholder of Soulbury, there is substantial evidence on the record to support a finding that Scott controls Soulbury to such an extent that he should be deemed to be acting through it to advance the forfeiture claim, and thus that his disentitlement should be extended to Soulbury.

For instance, William Scott, Soulbury, and the various companies in the Scott-WWTS universe all used the same business address in Antigua – although for Soulbury, as well as several of the other entities, the address alternated between the fourth and fifth floor of the same building.  The companies all spoke through the same handful of representatives – the fugitives William Scott and Jessica Davis (or Davis-Dyett), and one Gwen Salmon.  In addition, RBSI seemed to think that William Scott was in control of Soulbury, based on their business

19

relationship, and Soulbury's representatives referred to the company and account as belonging to Mr. Scott.  *See, e.g.,* Docket 57, Ex. A, Doc. 24 (July 5, 2001 Fax from R. Keiller to J. Davis-Dyett) (referring to "Mr. Scott" as "the beneficial owner/private client behind the company"); *id.* Doc. 31 (June 21, 2002 Letter from G. Salmon at Soulbury to R. Keiller at RBSI) (referring to "Mr. Scott [sic] Soulbury accounts with Royal Bank of Scotland").  At least one of Soulbury's other banks was under the same impression.  *See, e.g.,* Docket 57, Ex. A, Doc. 25 (Sept. 10, 2001 Letter from Antigua Overseas Bank to RBSI) ("Mr. Scott operates several company accounts in our books, including Soulbury Limited").

William Scott alone signed the February 2002 forms authorizing RBSI's investment management of Soulbury funds.  Docket 53, Ex. M.  In at least one instance, William Scott, acting alone, authorized RBSI to transfer money from the Soulbury account to a different bank account in his name, and on at least one instance, Susan and William Scott authorized Soulbury to transfer money to an account held in William Scott's name.  Docket 53, Exs. N, O.

Of course, it may prove unnecessary in this case for the Court to define the outer reaches of the disentitlement statute.  In a similar case, *Tamarind Drive*, the District Court found there was "reason to believe" a fugitive might be a majority shareholder in claimant corporations where the forfeiture complaint alleged he was "the administrator of at least one of the corporate claimants" and "purportedly used these entities to launder his own ill-gotten gains."  *United States v. All Right, Title and Interest in Real Property, Appurtenances, and Improvements Known as Tamarind Drive*, 2005 U.S. Dist. LEXIS 23819 at *13 n.6 (S.D.N.Y. 2005).  The same is alleged in this case, and supported by substantial evidence.  The court in *Tamarind* ordered discovery of the claimants' ownership structure, and converted the various motions to dismiss to

motions under Rule 56. Because the resolution of this matter can be resolved via discovery into the ownership and control of Soulbury, which are facts peculiarly within that party's control, and because the Court would be reluctant to order disentitlement without giving Soulbury ample opportunity to supplement the record, the Court will convert the government's motion to one for partial summary judgment, and will order limited discovery, as discussed more fully *infra*.

### C.    Factors Affecting Discretionary Application of Disentitlement

Even if the Court had been able to make all findings necessary for disentitlement, its inquiry would not end there, because, as Soulbury points out repeatedly, disentitlement rests in the sound discretion of the court. Even though the Court has tentatively concluded that the record before it supports the findings necessary for fugitive disentitlement, it should also consider whether that record discloses any reason for not invoking disentitlement.

### 1.    Due Process Concerns

Soulbury argues that disentitlement amounts to a due process deprivation because it deprives a claimant of a hearing, and relies primarily on two Civil War era cases that dealt with distinctly different sets of facts, *McVeigh v. United States*, 78 U.S. 259 (1870), and *Hovey v. Elliott*, 167 U.S. 409 (1897). This argument and those cases were dealt with nicely in *Collazos v. United States*, 368 F.3d 190, 202-05 (2d Cir. 2004), and the Court sees little point in revisiting well trod ground. Suffice it to say that disentitlement treats flight from justice as "tantamount to waiver or abandonment" of certain rights. *Ortega-Rodriguez v. United States*, 507 U.S. 234, 240 (1993). Furthermore, disentitlement need not forever bar the fugitive from vindicating his rights in property: he must simply submit to the jurisdiction of the court where he is criminally charged, and will then be free to press his claim to the seized property. The Court is not persuaded that

21

due process concerns should stand in the way of disentitlement, as a general matter.

### 2.    Weaknesses in the Underlying Complaint and Arrest *In Rem*

Soulbury also argues that disentitlement is inappropriate since there are, in Soulbury's eyes, serious infirmities in the government's forfeiture complaint and its pursuit of the arrest of the funds.  The Court is not persuaded by this argument.  First, a claimant who is subject to disentitlement has every right to challenge the seizure of his property, provided he face up to the criminal charges against him.  *Incline Village*, 47 F.3d 1511, 1518 n.2; *One Parcel of Real Estate at 7707 S.W. 74th Lane,* 868 F.2d 1214, 1217 ("By his own actions as a fugitive the [claimant] has disentitled himself from raising objections such as this to the forfeiture.").  Second, the Court has decided to treat the government's motion as one for partial summary judgment, focusing only on the question of whether Soulbury should be disallowed from pursuing its claim.  If it prevails at this stage, the government will still have to obtain judgment on the forfeiture action.

### 3.    Soulbury's Ability to Supplement the Record

Soulbury also argues that disentitlement is not appropriate at this stage because the somewhat confusing nature of the proceedings has deprived it of the ability to conduct discovery and supplement the record, as would be the normal course in deciding a motion for partial summary judgment.  *See* Soulbury Opp. [54] at 36.

Courts that have disentitled fugitive claimants generally had before them all the necessary facts because the claimant and the fugitive were the same individual.  Similarly, the course of litigation in those cases also made it clear to the parties that the court was considering dismissal or its equivalent based on § 2466, and would be considering matters outside the pleadings.  In this case, the motion for disentitlement came after Soulbury had already moved for judgment on

the pleadings, which would not call for consideration of extraneous matters. Soulbury also took the position that the government's motion was governed by Rule 12(f), which would not call for submission of additional material. Because of this procedural posture, it is possible that, despite the fact that every other court to consider disentitlement has looked to extraneous matters, Soulbury somehow did not know that the time was right to supplement the record in support of its bare contentions.

In a case such as this, where the Court is considering the strong step of disallowing a claim in a forfeiture action, the Court desires to ensure that the claimant gets a full hearing on the question of disentitlement, since disentitlement will have the effect of denying claimant any subsequent hearing in the forfeiture case. The Court wants to make sure that Soulbury is aware that matters outside the pleadings are to be considered in ruling on fugitive disentitlement, so that Soulbury has an equal opportunity to present such materials. Furthermore, resolution of the disentitlement issue is essential before the Court will consider taking up Soulbury's motion for judgment on the pleadings. This Court is of a mind that fugitives from justice should not be allowed to invoke judicial process and tax judicial resources if they are not willing to likewise grace the criminal courts with their presence. A claimant's filings will not be entertained until it can determined with some certainty that the claimant and a fugitive scofflaw are not one and the same.

To that end, the Court will convert the government's motion under § 2466 to one for partial summary judgment under Rule 56, and will permit the parties 90 days to conduct limited discovery on the applicability of the fugitive disentitlement statute to Soulbury Limited,

including inquiry into the ownership and control of Soulbury.[10]  At the close of discovery the government may renew its motion and supplement the record, and Soulbury will have the opportunity to oppose the motion and submit any appropriate materials to the Court.[11]

As with a case of jurisdictional discovery, this inquiry is limited in scope and less expansive than full blown merits discovery.  The Court is also sensitive to the fact that Soulbury, which is a defendant in the criminal case, and Scott, if he is indeed in control of Soulbury, should not be able to use discovery in the forfeiture action to gain an unfair advantage in any criminal case – and neither should the government be able to gain an advantage in one case because of the pendency of the other.  Pursuant to the Federal Rules of Civil Procedure and the authority granted to it by statute in forfeiture cases, the Court will thus fashion any appropriate protective orders sought by the parties to minimize undue disruption to the criminal case.

## IV.    CONCLUSION

The Court is able to tentatively conclude that the record currently before it supports the findings necessary to invoke the fugitive disentitlement statute to disallow Soulbury's claim, but that limited discovery is in order both to allow the Court to make an informed finding as to all

---

[10]A good place to start would be the questions propounded by the government in its Reply in support of its § 2466 motion.  Furthermore, the parties seem to have assumed that William Scott is the only relevant entity for the purposes of a § 2466 analysis.  However, it is possible that Jessica Davis' relationship to Soulbury is sufficient to impute her fugitive status to Soulbury.  Similarly, Soulbury's majority shareholder could turn out to be a corporate entity that in turn is held by Scott or Davis.

[11]Soulbury is reminded that if it refuses to cooperate with discovery requests, the Court may impose appropriate sanctions, such as deeming certain matters conceded, which could lead to disentitlement.  Soulbury is reminded that it also could risk dismissal of its claim with prejudice if it is found to run afoul of 18 U.S.C. § 986(d), which authorizes sanctions for certain refusals to permit "[a]ccess to records in bank secrecy jurisdictions."

elements of fugitive disentitlement, particularly the ownership and control of Soulbury, and to ensure that Soulbury has a full opportunity to supplement the record.

The Court thus regards the government's Motion [53] to Strike Soulbury's claim and answer as a motion to dismiss under 28 U.S.C. § 2466.  Having been invited to consider matters outside the pleadings and having done so, the Court will convert the motion to one for partial summary judgment under Rule 56 and deny the motion, without prejudice to renewal, so that the parties may have 90 days to conduct discovery limited to the applicability of the fugitive disentitlement statute.  At the close of discovery the Court will entertain a renewed motion for summary judgment and opposition thereto on the question of whether disentitlement should apply.  The Court thus will deny without prejudice the Motion for Judgment on the Pleadings until it determines whether Soulbury should be allowed to proceed with its claim.

A separate Order shall issue this date.

Signed by United States District Judge Royce C. Lamberth, March 21, 2007.